## XIQUES et al. *v.* BUJAC et al.

| 7  498
52  1176

In 1807 *Delogny* and *Livaudais* laid off two tracts of land, within the corporate limits of New Orleans, according to plans on which figured a square designated as "Place de l'Annonciation." In the middle of the square there is an "Islet," on which is drawn the ground plan of a building, of vast dimensions, marked "Eglise de l'Annonciation. The square "de l'Annonciation" and the "Islet" were, for nearly half a century left in the condition of suburban property—vacant, unoccupied, and abandoned. During this time the original owners, nor their heirs, paid taxes on that property. The heirs of *Delogny* and *Livaudais* attempted to divide and sell the Islet  The owners of property who derived title from purchasers under the original plan, brought suit to defeat the action of the heirs, on the ground that the rights of the purchasers were paramount and prescriptive.

The controversy involved a consideration of the legal effect resulting from the particular

designation of this Islet on the plan, and the non-user of it by the original proprietors and those claiming under them.*

The effect of the designation on the plan did not, under the laws of this State, create a dedication to the use of the public, or a servitude in favor of the proprietors. *Eustis*, C. J.

The spot thus designated on the plan for the erection of a church is not a *locus publicus*, but private property. There was no objection on the part of the owners to the erection of the church, and full effect is given to the designation, by considering it a donation in favor of any individuals or congregation which might accept it for that purpose. But if, for nearly half a century it has never been attempted or offered to be done, this right is barred by lapse of time—by the prescription of thirty years. Nor can the owners be compelled to keep the place open for the common use of the purchasers of the property, when the right is thus barred. *Eustis*, C. J.

No dedication to public uses can be inferred from the designation of places of public amusement or of public worship, on the plans of towns and suburbs, as, under the laws of this State, they are invariably private property. *Eustis*, C. J.

By the Spanish law things established for the service of God were held sacred, and the dominion thereof was not in any person. *Eustis*, C. J.

In Louisiana all titles to land were, and remain allodial and not feudal. *Eustis*, C. J.

It is conceded that no particular form of dedication is necessary; but the evidence of the intention to dedicate must be conclusive, and the dedication must be accepted by user or otherwise, in the sense in which it is made; if there was originally a dedication of the land in controversy, which I do not admit, it was a dedication to build a church, which was not accepted in seasonable time for the purpose intended; and the popular conceit, that the land has been acquired to the public by another use not thought of by the grantor, and exercised under the circumstances disclosed by the evidence, is to me an unsatisfactory basis for a judicial action. *Rost*, J.

In relation to public places and streets within this city, the municipal authorities represent not only the corporators but also the public; a final judgment against them is a judgment against the public, and no individual can bring the point adjudicated again before the courts. *Rost*, J.

The servitude of way never extends beyond the breadths of the street adjoining the property entitled to it. *Rost*, J.

It is not necessary for the city to show title to its common and public property. Such property is usually acquired by dedication and the cessation of all claim to it by the former owner. *Preston*, J., dissenting.

*Delogny* and *Livaudais* dedicated the whole of Annonciation Place, including the site of the church, to the public use, forever; the whole was accepted the day the first sale was made by their plan; that dedication has been fully proved by their cessation to claim any part of it as private property, and by the public and notorious use of it as public property for forty years before they advertised it for sale. Its destination may be changed by the unlimited sovereign power of the State, but by no other power on earth. *Preston*, J.

When, by natural or other events, a public place cannot be used any longer for the purpose for which it was once destined, and has necessarily lost the legal character which its destination and consequent use had given it—has, perhaps, become a nuisance instead of a public benefit—then the sovereign may change the destination. *Preston*, J.

A judgment against the right of a city to public property, will not bar an individual who was no party to the suit, and who is interested in maintaining the dedication. *Preston*, J.

Where property is sold by a plan, the ideas which it conveys are as binding on the vendors, as the words in a deed of conveyance. *Preston*, J.

The vendors of this property did not bind themselves to build the church on the Islet, but they bound themselves never to build anything else on the ground. *Preston*, J.

XIQUES
v.
BUJAC.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *Randell Hunt* and *H. H. Strawbridge*, for plaintiffs. *Soulé* and *Maurian*, for defendants.

---

*The above statement of facts is correct as far as it goes, and will render intelligible the points of law decided by the court. But for a thorough comprehension of the whole case, and a proper understanding of the views of the several judges, a detail of facts would be necessary that would occupy entirely too much space for an abstract. This detail will be found in the opinion of the judges, to which the reader is referred.

The following is a Plan of the property in controversy:

By the court: *(Slidell*, J., recused himself.)

EUSTIS, C. J. The plaintiffs allege that they are owners of certain lots around and fronting the public square, designated as " Place de l'Annonciation," on a certain plan under which the lots in that portion of the First District of the city were laid out and sold; that in the middle of this place is a square or islet bearing the number 34; that on said islet is depicted the ground plan of a building of vast dimensions, having a cupola in the centre and fronts on the respec-

tive sides, which building is marked on the plan as " Eglise de l'Annonciation," is in the form of a great cross, and occupies the whole of the area except the corners; that by this designation on said plan, the founders of the former suburbs Lacourse and Annunciation, in which this property is all situated, destined and appropriated this islet as the site of a church, and renounced the right of appropriating it to any other purpose. The petition sets forth the right to enforce this destination, by reason of their purchases under the plan, and the abandonment of the space on the part of the original owners; of the possession, by the proprietors of the lots around it for many years, or by the citizens and authorities of the city, with the sanction and approbation of the original owners, &c.

The heirs of *Delogny* and *Livaudais* being about to divide this islet and sell it out in lots, at auction, the plaintiffs instituted this action, in which they ask a decree that their rights of ownership and others, relating to this space, be adjudged to be prescriptive and paramount to any claimed or set up by the defendants; *that the defendants be adjudged to have no right, interest or title to the same; or,* if they have any, that it be adjudged to be subject to the obligation of erecting the church, or of causing or permitting one to be erected according to the plan. The petition sets forth the ground of the plaintiffs' action with great fulness, and the prayer for relief is ample. The defendants were enjoined from selling the property, until the further order of the court.

The judgment of the district court held the defendents to be the absolute owners of the property, and the plaintiffs have appealed.

The plan under which the plaintiffs' rights are asserted, was before the Supreme Court in the case of *Livaudais* v. *Municipality No. Two,* 16 L. R. 512. The plaintiffs in that suit recovered from the municipality a square of ground designated on the plan as *Colisée.* The court determined that this designation did not amount to a dedication to public use, or vest the title in the corporation. In the case of *Livaudais* v. *Municipality No. Two,* 5 Ann. 8, the identical square concerning which the present suit is brought, was the subject of litigation, and the court considered it too clear for argument, that the title did not pass under the dedication described in that plan. We think it decided in both these cases, that no dedication to public uses can be inferred from the designation of places of public amusement or of public worship, on the plans of towns and suburbs, as with us they are invariably private property. In the latter case, the court considered that there was no evidence out of the plan to show any dedication to public use, or an acceptance or any prescriptive right acquired against the present defendants.

We find nothing in the evidence which changes the view we then took of the dedication to public use, either as resulting from the plan itself, the acts of the parties, or the prescriptive right asserted by the present plaintiffs.

If the property in this square was not divested from the original owners, and no dedication to public use has been effected, the inquiry is as to the nature of the right asserted by the present plaintiffs. Is it a right of servitude or a real right? We think neither can be assumed as established in any legal sense. *New Orleans and Carrollton Railroad Company* v. *Municipality No. Two,* 19 L. R. 62, and *French* v. *The New Orleans and Carrollton Railroad Company,* 2 Ann. 80. The principles on which these cases were decided, we think, are conclusive against the existence of any real right in favor of the plaintiffs' lots, adversely to that which is the subject of this litigation. The titles or tenures by

XIQUES
v.
BUJAC.

which real property is held with us are defined in the Code, as well as the real rights which can be established in relation to it, and no others can be recognized · as attaching themselves forever upon it, without breaking down the distinctive barriers of property, and introducing inextricable confusion in the law regulating it, which, for the wisest purposes, is plain, inartificial and easy to be understood, and apt for every reasonable purpose of use.

In the case of *Livaudais* v. *The Second Municipality*, which related to the Coliseum Square, an expression fell from the court which appears to embody the views of the plaintiffs in the present case. In *Livaudais'* case the court observes : " There is no evidence of the alleged dedication out of the plan in this case, and none in the plan out of the word Coliseum. In the same plan is marked a *locus publicus* called La Place de l'Annonciation, in the middle of which is a spot designated as a place for a church. If the plaintiff did not, by this designation, contract the obligation of building a church, he certainly renounced the right of appropriating it to any other object." In the latter part of the opinion, we think this expression is somewhat qualified.   The court says : " As we have said with regard to the spot designated for a church, the obligation which the plaintiff has contracted, by the use of the word Coliseum, might certainly be discharged by the erection of such an edifice.   In the meanwhile he may have lost the right of using the square for any other purpose.   As to the erection of the edifice, who has put him *in morâ?*   If the building is not necessarily to be erected by him, who has offered to erect it?   Who has accepted the donation which results from this dedication ?" &c.

We do not think, that as a matter of argument, this *obiter dictum* aids the plaintiffs.

The difficulty of stating the distinct legal right claimed by the plaintiffs, is apparent in the written argument of their counsel.   Hence, the equity of their case is strongly pressed, and the impression on the part of the plaintiffs, and of those interested, is undoubtedly in favor of the right asserted.   This impression seems to be, that if the plan does not require that a church should be erected, it involves an obligation on the part of the original owners, that no other building should be erected on the site designated, which should remain open, to be used by all the purchasers of the lots in common, until reclaimed for its original purpose by proper authority ; that this was its destination in reference to the surrounding property, and was one of the inducements held out to purchasers. That the original owners, by this designation, undertook to build the church, is not pretended.   The whole amount of the sales of the property would not have paid one-fourth of the expense.   They might, as such, have been expected to have built an amphitheatre on the place designated for a coliseum.

The law not considering this spot as a *locus publicus*, under the designation in the plan, and the plan indicating an object exclusively within the dominion of private property, and there being no obligation on the part of the owners to erect the church, full effect is given to this designation, by considering it as a donation for the written purpose, in favor of any individuals or congregation which might accept it for that object.   This seems to be the only mode contemplated at the time, in which the erection of the church could be secured eventually, and thus the object of the dedication attained.   But this has never been attempted, or offered to be done, nor is it now proposed to be done, after the lapse of half a century.   And we think any such right on the part of the purchasers must be held to be barred by lapse of time, by the prescription of thirty years.   The

plaintiffs are not in a situation before the court, in which the right, if any existed, could inure to their benefit. It is difficult to perceive, under this view of the subject, how a right can be inferred in this state of things, to keep this place open, for the common use of the purchasers of the property.

We have considered the acts of the parties concerning the use and possession of this land, in relation to the prescriptive right of the plaintiffs. Previous to the enclosure by a fence, by one of the proprietors of lots fronting on it, some fifteen years since, we do not find the rights of either party affected by anything which transpired in relation to it. It was vacant—that is, not occupied or enclosed, and left in the condition of suburban property laid out in lots, which owners do not feel disposed to incur the expense of enclosing. The non-payment of taxes by the defendants, we think, does not of itself impair their rights: it is not proved that any taxes were assessed on the property.

The district judge has prepared a very elaborate opinion on the case, in which we mainly concur. From the best examination we can give to the subject, we have no doubt whatever as to the effect of the designation on the plan, as not constituting, under our jurisprudence, a dedication to the use of the public, or a servitude in favor of the front proprietors.

In relation to the appeal made to the exercise of the equitable powers of this court in behalf of the plaintiffs, we would observe, that they can only be called forth for the enforcement of clear and well-defined rights. We have very strong doubts whether, *in foro conscientiæ*, the case is in their favor. It seems to us clear, that it does not present a claim which a court of justice can legally enforce. Pothier on Obligations, Nos. 1 and 197. *Hubgh* v. *Carrollton R. R. Co.* 6 Ann. 511.

The date of the plan carries it back to a period when the Spanish law was in force, and previous to the abolition of the distinction relating to sacred and religious things, and of their inalienability, by the corporations to which the law recognized them as belonging. Code, 447. Code of 1808, book 2, tit. 1, chapter 1, art. 9.

By the Spanish law, things established for the service of God were held sacred, and the dominion thereof was not in any person, and could not be counted as property. The laws on that subject were borrowed from paganism; but nevertheless, since the solemn consecration of churches and cemeteries was established, immediately on things being consecrated, religion was considered as occupying them, and being irrevocably inseparable from them. The consequences of this principle were regulated by the common law institutes of the law of Spain, book 2, tit. 1, p. 73.

As the Catholic religion was the dominant religion in the city and State at the time of this alleged dedication, the name of the place, and of the church, its form and dimensions, leave no doubt in the mind, that the church for which the spot was designated, was to be of the Catholic faith exclusively. It is not pretended, that any offer has been made to accept this donation, if so it may be called, on the part of any Catholic congregation, or any other. Nor do the plaintiffs even intimate any intention or purpose of appropriating the land to such an use.

I am not aware, that there is anything in this case, which calls for any modification of the general doctrine of the dedication of property to public uses, and as expounded in the decisions of our predecessors, and recognized afterwards by this court. The fullest recent case on this subject, is reported in 8th Ben. Monroe's Reports, p. 233, in which the principles of the doctrine are expounded

XIQUES
v.
BUJAC.

and explained with great ability, by the Court of Appeals of Kentucky. To this doctrine I assent. But the doubt in my mind is, whether this case comes within it, the destination of the land being for a Catholic church; an object which, by an express article of our code, is within the dominion of private property, and not inalienable.

I must add, that the general doctrine laid down in common law courts, has been admitted by our courts, with some modification, resulting from our different system of laws. In Louisiana, all titles to land were, and remain allodial, and not feudal. The feudal law, and its usages, never had a place in this region, under the Spanish government, and the jurisprudence of real property, under the common law, cannot be applicable to land titles in this State.

I should be gratified to be able to defer my humble opinion to any long existing general opinion, in favor of a public right; but the right of a citizen to his property, which the law gives him, is the highest of all public rights, which all men have the deepest interest in vindicating and maintaining.

According to my impressions, the use of this square for the purpose claimed by the defendants, defeats the destination made by the founders of the suburb, instead of giving it effect.

Judgment affirmed, with costs.

PRESTON, J., dissenting. For forty years, a large and beautiful double square in the first district of this city, called Annonciation Place, has been regarded as public property. Annonciation Place is a parallelogram, composed of a square, and the halves of two adjacent squares, between Race and Orange, John the Baptist and Constance streets.

In 1807, *Robin Delogny* and *François Livaudais*, jointly, laid off two small tracts of land within the incorporated limits of the city of New Orleans, into the faubourgs La Course and Annonciation. *Delogny* no doubt was fond of the course. *Livaudais* was agent of the nuns, who owned a small tract adjacent to him. The dividing line between the tracts of *Delogny* and *Livaudais*, run diagonally through the place, which is the subject of this suit. Each contributed half the ground, if it is a public place.

Religion prevailed over racing, and they christened it " Place de l'Annonciation." A smaller parallelogram, in the centre of the large one, is laid off. In it a building is sketched, in the form of a cross, and its destination is evidently designated by the name, " Eglise d'Annonciation," Annonciation church.

The heirs of the founders of the faubourg, claim this smaller parallelogram as their private property, and were about to sell it at public auction, in small lots. The plaintiffs, proprietors of lots fronting on Annonciation Square, have enjoined the sale, alleging that the property is public, and that the sale of it as private property, would be highly prejudicial to their rights.

There has been much controversy about the title to the property. It is admitted, that the title was originally in *Delogny* and *Livaudais*, and then it is contended, on their behalf, that those who dispute their present title, must show a deed and conveyance in writing, and not by parol; and assuming, that if it was conveyed, it was by donation, that the donees must show their formal acceptance.

We deal so much in controversies about title, and at common law about the fee, that it is a kind of dogma with civil lawyers, that real property cannot exist without a title in some one, and with common law lawyers, that the fee of real estate can never be in abeyance, but must always be vested somewhere. They stickle for it so much, that one would think they would rather see land struck

out of existence, than that it should exist without a title, or that the fee should be in abeyance.

Now, if we will look a moment at things, without obscuring our ideas with technical words, we will see many things which belong to nobody, and to which therefore, the terms title or fee are not applicable. The 441st article of our code informs us, that "Things which are common, are those of which the property belongs to nobody in particular, and which all men may freely use, conformably to the use for which nature has intended them, such as air, running water, the sea, and its shores." God has given them to the world, and there can be no acceptance of the donation, except in its grateful use.

So there are things common to a nation, as its navigable rivers, harbors, and highways. Its title is its sword, without any writing or parchment. And these gifts of nature are public things.

Now, things may be made public by man, as well as by nature. Things, says our code, which are for the common use of a city, as streets and public squares, are likewise public things. When they become so, they are out of commerce, to be neither bought nor sold, and the term title is inapplicable to them; there is no fee in them. Those are terms which indicate the right to private property, and its modes and mutations. A city may have private property, as a lot bought by the corporation for taxes. To such property, it must show written title. But to the public and common things of a city, it is not necessary to show title. They are generally obtained by dedication, and the cessation of all claim to them by the former owner. They are accepted, not by an act before a notary public, because, as they belong to everybody, now, and in all time to come, it would be a long acceptance, and would have to be kept open forever. They are accepted by the common use of all persons. As the dedication is intended to be perpetual, all the learning about titles, usufruct, servitudes, *et id omne genus*, ceases to have any application to the subject matter, because all those rights are extinguished as to property out of commerce, and belonging in perpetuity to everybody. Those rights are predicable only of exclusive or partial ownership by individuals or corporations, not of universal use by all men, and forever.

In my opinion, *Livaudais* and *Delogny* dedicated the whole of Annonciation Place, including the site of the church, to the public use forever; that the whole was accepted, the day the first sale was made by their plan, and that the dedication has been fully proved, by their cessation to claim any part of it as private property, and the public and notorious use of it as public property, for forty years before they advertised it for sale in lots. If so, it does not belong to them, nor to the city, nor to individuals, and is not susceptible of private ownership, nor the subject of actions, petitory or possessory. It is the subject of administration and regulation by the city, under its municipal powers. Intrusion upon it, inconsistent with its destination, may be resisted by the city, and by individuals, as will be seen hereafter. Its destination may be changed by the unlimited sovereign power of the State, but by no other power on earth. Until then, it is not susceptible of private ownership or alienation, and is as much out of commerce, as fire, air, water, the rivers, seas, or oceans.

The subject of the dedication of property to public use, has been much discussed, and there seems to be well settled principles with regard to it, both at common, and in the civil law, and they are remarkably accordant. It is a subject upon which the rules must, from the nature of things, be very much the same in all countries, and at all times.

64

In the case of *Jarvis* v. *Dean*, 3 Bingham, 447, Chief Justice Best told the jury, that if they thought a street in the parish of Islington had been used for years, with the assent of the owner of the soil, they might presume a dedication to public use. And the jury found a verdict for the plaintiff, although the street had been used as a public road only four or five years. The verdict was sanctioned, the court saying, the jury were warranted in presuming it was used with the full assent of the owner of the soil.

In the case of *The King* v. *Lloyd*, 1 Camp. 262, Lord Ellenborough said, if the owner of the soil throws open a passage, and neither marks by any visible destination, that he means to preserve all his rights over it, nor excludes persons from passing through it, by positive prohibition, he shall be presumed to have dedicated it to the public.

In the case of *White* v. *The City of Cincinnati*, it appeared, that the founders of the city had made a plan, according to which the ground lying between Front street and the river was laid out as a common, for the use and benefit of the town, and no lots were laid out on the land thus dedicated as a common.

The suit was brought for a part of the ground thus laid off, and usually denominated, "the common." The Supreme Court of the United States rejected the claim. They said: "There is no particular form or ceremony necessary, in the dedication of land to public use. All that is required, is the assent of the owner of the land, and the fact of its being used for the public purposes intended by the appropriation. The dedication was for the public use and convenience, and accommodation of the inhabitants of Cincinnati, and doubtless, greatly enhanced the value of the private property adjoining the common, and thereby compensated the owners for the land thus thrown out as public grounds. And after being thus set apart for public use, and enjoyed as such, and private and individual rights acquired with reference to it, the law precludes the original owner from revoking such dedication. It is a violation of good faith to the public, and to those who have acquired private property, with a view to the enjoyment of the use thus publicly granted." 6 Peters, 438–440.

In *Barclay* v. *Howell*, the same court applied the same principles to the space left by the proprietor, between Water street and the river, in founding the city of Pittsburg. 6 Peters' Rep. 498.

The same principles were maintained by the Spanish tribunals in Louisiana, before the change of government. *Bertrand Gravier* established the faubourg St. Mary, between the years 1788 and 1795, and sold lots by a plan, exhibiting the present Lafayette Square undivided, and with other indicia of a public square. His successor, *Jean Gravier*, imagining that as no deed had been given for this square, the title had not been transferred, and that it still constituted a part of the estate of *Bertrand*, began to erect buildings upon it. His pretensions were opposed, and by decrees of the Spanish tribunals, it was ordered, that the square should be left free for the public use, and that the buildings he had begun to erect should be demolished. The decrees were afterwards recognized to be valid by the Supreme Court of this State, and a second attempt to convert the public square into private property, was defeated by that tribunal.

The same principles were adopted by the superior court of the Territory, in the case of *Gonzales* v. *The City of New Orleans*.

The subject of dedications was much discussed, in the case of *Cucullu* and *De Armas* v. *The City of New Orleans*. The late Chief Justice Martin laid

down the true principles, applicable to public places, established by the sove-
reign, and *a fortiori*, to those established by sovereign individuals. Of public
places, he says, the public may claim the use, by exhibiting evidence of its
dedication to its profit by the sovereign, without any letters patent, grant or deed.
The only evidence exhibited in the case he was discussing, was plans of the city
of New Orleans, as founded by the sovereign.

In an opinion of singular learning and ability, he maintained the views of the
Supreme Court of the United States, in the case of *The City of Cincinnati*
v. *White*. He repudiated the idea, that the case was decided upon princi-
ples peculiar to the common law of England, and showed, that the decision
rested upon the broad and general principles of law, mentioned in the Corpus
Juris Civilis: " *Honeste vivere*, to act honestly; *polliciti servare fidem*, when we
have made a promise, to keep it; and the necessary corollary, *turpe est fidem
fallere*, it is shameful to disappoint expectations we have authorized." 5 L.
R. 170.

It is true, his opinion as to that particular case, was overruled by a majority
of the court, yielding to an *ex parte* parchment, signed by the President of the
United States; and a private building, erected on the very top of the levee,
between the two markets of the first district of the city, remains to this day a
palpable monument of their error. The opinion and views of Judge Martin
were greatly approved by the Supreme Court of the United States, in the case
of *The United States* v. *The City of New Orleans*, and were, indeed, the
basis of their decision in favor of the dedication to public use of all the property
in front of the old square of the city.

The French government, which founded the city, left a large space in front,
marked quay. The abandonment of it to the public, and especially marking it
"quay," made it a public place, no longer susceptible of private ownership,
until its destination should be changed by the sovereign. It is true, that when,
by natural or other events, the public place cannot be used any longer for the
purpose for which it was once destined, and has necessarily lost the legal char-
acter which its destination and consequent use had given it, has perhaps become
a nuisance, instead of a public benefit, then the sovereign may change the desti-
nation. Thus, as mentioned by Judge Martin, the remarkable port of Aigues
Mortes, in France, from which St. Louis embarked with the soldiers of the
cross for the Holy Land, during the wars of the Crusades, is now at the distance
of a league from the sea. The sovereign, no doubt, has alienated the land
formed by alluvial deposits, and disposed of the proceeds for the inhabitants, who,
by natural events, have lost their port, as is always done on the principles of
equity in like cases.

So the city of New Orleans sold a portion of the vacant space in its front, left
for a quay, as it could no longer be conveniently used for that purpose. The
corporation, indeed, sold it without authority, but subsequently obtained the
sanction of the sovereign Legislature to the sales, and to the receipt of the price.
To the remainder, as well as to the beautiful square in front of these halls, the
church, and municipal buildings, I know of no title but dedication to the public
use, and of no written acceptance, but an acceptance far more notorious—that of
daily public use.

In the case of *The City of Lafayette* v. *Holland et al.*, the Supreme
Court of the State again recognized fully the principles of dedication, as
laid down by the English judges, and the Supreme Court of the United States

in the case of *White* v. *The City of Cincinnati*, and under these principles, presumed a dedication of the batture in front of the nun's suburb, and of all the space front of the squares, and lots enclosed by lines, as private property, because the nuns left it open in their plans, and ceased to use it as private property. 18 L. R. 251.

In the celebrated case of *The Second Municipality* v. *The Orleans Cotton Press*, the judges unanimously recognized these principles of dedication, although the decision was against the dedication claimed in that case, on the question of fact alone. The views of the Supreme Court in the case of *The City of Cincinnati*, and of Judge Martin in the case of *Cucullu* and *De Armas* against this city, were quoted with entire approbation. 18 L. R. 237.

This court, in the case of *The Carrollton Railroad Company* v. *The Town of Carrollton*, admitted the principle, that no particular form or ceremony is necessary, in the dedication of land to public use, and that all that is required, is the assent of the owner of the land, and the fact of its being used for the public purposes intended by the appropriation. The subject under consideration, was a dedication by plans referred to in deeds, not by a deed or grant to the corporation. 3 Ann. 284. I consider the cases of *Arnauld* v. *Wiltz*, and *Delabigarre* v. *The Second Municipality*, as involving the same principles. The plaintiffs had abandoned all their particular and exclusive interest in the lands claimed in favor of the common interest of the public, and were not therefore permitted to resume it. It was said it would be unjust to the public, and to those who acquire property in reference to a plan, with a view to the enjoyment of the use thus publicly granted, afterwards to appropriate it to private uses. 4 Ann. 118.

The cases of *Challon* v. *Pepin*, 13 L. R. 534, and of *Dowlin* v. *The Nashville Railroad Company*, 5 R. R. 6, proceed upon the same principles.

In the case of *Livaudais* v. *The Second Municipality*, 16 L. R. 513, in relation to the place marked "Coliseum," on the plan now under consideration, Judge Martin, in rendering the opinion of the court, refers to the place which is the subject of this suit, as follows: "In this same plan, is marked a *locus publicus*, called La Place de l'Annonciation, in the middle of which is a spot, designated as a place for a church. If the plaintiff did not, by this designation, contract the obligation of building a church, he certainly renounced the right of appropriating it to any other object."

Notwithstanding this strong intimation of a total want of right to the property in controversy, the defendants, in 1848, instituted a petitory action against the Second Municipality for the property, and the district court rendered judgment in their favor. The present defendants thereupon treated the place as their private property, and proceeded to offer it for sale in small lots, when they were enjoined by the plaintiffs in this suit.

The judge of the district court has considered the present plaintiffs bound by the decision of this court, in the case of the present defendants against the Second Municipality, in which, in a petitory action, they were decreed to be the owners of the property. It is stated by the court, that the judgment of the district court was affirmed in that case upon bad pleadings, and erroneous admissions. Corporations are generally worse represented in lawsuits, than private individuals. Like minors, they are to be considered in a perpetual state of pupilage, and should not be deprived of great rights, amounting to the alienation of their property, by the errors of their counsel.

But, it is to be further observed, that the district court, whose judgment was simply affirmed, expresly reserved the rights of the proprietors fronting on Annonciation Square, because they were not in court, and the municipality had no authority to represent them. And the court expressly called upon them to come forward and vindicate their rights. They have done so in this suit; and now it is said, nothwithstanding the call, the judge adjudged the matter finally against them in their absence, in a suit to which they were not parties.

The interest of a proprietor fronting on a public square or street is so great and direct, compared with that of citizens more remote, or the interest of the whole city, to maintain a dedication of them, that it appears to me right and proper that they should always be made parties to a suit affecting the dedication; that the city does not represent their great and immediate interest, and that they cannot be bound by a judgment distinctive of the dedication, in a suit to which they were not a party.

I do not therefore consider the plaintiffs bound by the judgment in the suit of the present defendants against the Second Municipality, because they were not parties to the suit; because they had great interests in the matter, and more immediate than those of the Second Municipality, which it could not represent, and finally lose the suit, being badly defended; and because their rights were expressly reserved by the judgment.

What are the rights of these individuals? The defendants are about to sell, for the purpose of private buildings, property which they allege is public and common to all men, and the common use of which is invaluable to them in particular. They may, certainly, prevent the building of what they might destroy if already erected. Now, the 857th article of the Civil Code prescribes : " That works which have been built on public places may be destroyed at the expense of those who claim them, at the instance of the corporation or of any individual of full age, residing in the place. And the owners of these works cannot prevent their being destroyed, under the pretext of any prescription or possession, even immemorial, which he may have had of it, if it be proved that, at the time these works were constructed, the soil on which they were built was public and has not ceased to be so since. The suit is, therefore, properly brought. The plea *res judicata* is not supported, and no prescription can prevail against the public use if the place in controversy is a public place.

It remains to be inquired, whether, according to the principles already stated, *Delogny* and *Livaudais*, in point of fact, dedicated the property in controversy to public use.

Each of the proprietors made, and deposited with a notary public, a prospectus, which contained, as expressed, the obligations to which they submitted for the sale of their lots. By it, all the lots were to be sold, from the Levee to Dryades street, separately or by squares, according to the plan made by Lafon, Surveyor of the county of Orleans, and deposited in the office of Pierre Pedesclaux, Notary Public. The lots around Annonciation Place were sold, and those from which the plaintiffs derive title were sold as fronting on Annonciation Place or the streets adjacent to it, as expressed in the authentic acts of sale.

The plan is thus made a part of the prospectus and deeds of sale. They all form one whole. A plan should be a daguerreotype of the thing itself, a picture of the ground, as if thrown by a camera obscura upon the paper. A plan, like a written document, conveys ideas to the mind, and when those ideas clearly appear on the plan or may reasonably be inferred from it, they are as

binding on the vendors as the words in the deed of conveyance, when the plan is referred to in the deed. For, though words ordinarily convey our intentions and express our obligations, yet signs may do the same; and, if such signs be spread in unmistakable forms on record, there is no difference in the effect between them and formal words.

The plans are, in fact, the surveys and plats of town property, and govern its sales as much as the surveys and plats of country estates govern their transfers. If, for example, I buy a tract of land by a plat exhibiting a front upon a river, I may go to the river for location and *quantity, although* the river is not mentioned in the deed. So, if I buy a lot fronting on Annonciation Place, the vendor binds himself, that there is and forever shall remain, so far as depends on him, such a Place.

*Place* is a French word, and means a public place surrounded by buildings, kept open for the embellishment of a city or the convenience of its commerce. Annonciation is a religious term, and refers to the tidings brought by an angel to the Virgin Mary of the incarnation of our Saviour. Annonciation is the name of the place in controversy, and *Place* qualifies it as a public place for the embellishment of the city.

It seems to be admitted, because it cannot be denied, that parts of the large oblong figure on the plan represents ground dedicated to public use, and are, therefore, public things. The contest is as to the small parallelogram in the centre of the large one, and in which the ground plan of a church is represented. The defendants contend, that this figure represents private property; the plaintiffs, that the whole of the large oblong figure partakes of one character and represents an entire thing, dedicated to public use, and thereby destined to the class of public things.

The whole of the large oblong figure is represented on the plan of the Faubourg Lacourse and Annonciation, made in 1807, by *Delogny* and *Livaudais,* as an open space. The ground plan of a church is exhibited in its centre, but the whole oblong figure is represented as one entire thing. It is even composed of one whole and parts of two other squares at each end. The figure further represents an undivided thing. The lines of Pecanier and Annonciation streets, which would otherwise pass through it, are arrested when they arrive at the Place Annonciation. Therefore, no streets can pass through it to divide it into three parts, so as to separate the middle of the oblong figure from the two ends. This alone is conclusive that, as part of the ground is clearly dedicated by the plan to public use, the whole must be; because, by the plan, it is undivided.

There is another circumstance which renders it absolutely certain that the whole ground represented by the large parallelogram, was dedicated to the public use. The small oblong figure intended as the site of a church is in the centre of the large one. The name of the whole, as written on the plan, is " Place de l'Anonciation." If this name was all written at either end of the whole figure, or repeated at both ends, there might be some pretext for saying that the middle figure, and ground represented by it, was left undedicated. But half the name, " Place de," is written at one end of the whole figure, and the other half, "l'Annonciation," at the other end; showing indubitably, that the whole of the large parallelogram partakes of the same character and was laid off for one purpose—the dedication of the whole of it to public use. The church square, which divides the name of the whole, having half of it on one

side and half on the other, is as much the Place Annonciation as the two small parallelograms on each end of the great one, on each of which half the name of the whole is written, the church location being between the parts of the name. It cannot be said, then, that the ends of the whole partake of a character different from the middle. If a painter had drawn the full likeness of a certain patriot, and, lest the portrait might be mistaken, had written "George," at the head, and "Washington," at the feet, as well might it be pretended that the whole represented, the head and feet of George Washington, and the body of John Adams.

Another fact, palpable on the plan, renders it absolutely certain that the space left for the church never was intended to be, and never can be used as private property. The church figure is bounded on both ends by a space which clearly belongs to Annonciation Place, because, on the plan, Pecanier and Annonciation streets are not continued through so as to pass by its ends. And it is equally manifest, by an inspection of the plan, that the sides of the church figure are not bounded by Race and Orange streets, because they do not extend to them. There is a space of forty-five feet on each side, which clearly belongs to Annonciation Place, and not to the church figure. The founders of the faubourg could never, therefore, have reserved the figure in the interior as private property, because there is no possible access to it by streets. The access over public property could never accommodate private occupants. They want wood, water and provisions, which must be hauled to their premises, and to send away all the offal that accumulates in places used for private dwellings or occupations. This the city, as the administrator of public property, could never permit, over that which was dedicated to public uses of an entirely different character. Gravelled promenades, grassy beds, for juvenile gambols, or gardens, like those of Carrollton and Jackson Square, in which to enjoy, in our sultry climate, refreshing breezes, surrounded by the beauty of our southern shrubbery and the fragrance of its flowers. What could be more loathsome to those delightful, improving and refining pleasure parties, formed of both sexes, on our hot summer evenings, as if fully to repay all our daily toils, while enjoying their cooling lemonades, creams, or fruits, in a parterre of the gardens of Annonciation, than to be disgusted by dirty negroes brawling at their stubborn mules, while trailing their filth carts from the private dwellings in the interior. On the other hand, Christians, saddened by their sins, passing to the church of Annonciation, to which the place was dedicated, relieved by confession and prayer, and repassing, gladdened by the tidings of a Saviour, would give even to pleasure a serious character, edifying and useful to its votaries. If this place is converted to private property, so different from the universal understanding and belief, the city would be justifiable in separating it by a wall from Annonciation Place, surrounding it on all sides, so that it never could be used but for a private prison, accessible to pedestrians alone.

Another circumstance, patent on the plan, is conclusive, that all private ownership in the whole parallelogram was abandoned, and that the whole was dedicated to the public. The dividing line between *Livaudais* and *Delogny* is exhibited as running between the whole extent of their property, except through the whole of Annonciation Place. On both ends the lines are arrested by the oblong figure which is thrown into a common property for the public use. The force of this circumstance will be seen by observing that the side lines of their tracts make acute angles with the bank of the river. And yet they have

established their squares to be parallel, as far as possible, to the river. From the two causes, the dividing line between them cuts many of the lots into the smallest irregular fractions, and yet each retained his fraction of a lot so divided.

It may be said, as the dividing line between them would have passed diagonally through the church figure and cut it into triangles, by stopping it, they intended, at all events, to make common private property of what was represented by that figure. But private individuals always make common property, of portions respectively owned by them, by an agreement in writing, and in those early times, it was always done by act before a notary, on account of the deficiency of notarial or legal knowledge among individuals.

Another fact apparent on the plan, which is conclusive against the pretensions of the defendants to the property in controversy as their private property, is, that the squares and lots in the faubourgs Annonciation, are painted yellow; those in Lacourse, red; and it is written on the plan, that the parts painted yellow, belong to *Livaudais*, and the parts painted red, to *Delogny*. Now, the whole of Annonciation place, the whole of the streets, the battures which they abandoned to the public, the Cours Prytanée and other places, are all left white, showing that they all partake of the same character; and, that private ownership being abandoned for the common benefit, they were all alike dedicated to the public use.

Again, all the squares around Annunciation place, were divided by the founders of the faubourgs into lots, which are even numbered; indeed, all the most valuable squares on the plan are so divided. This shows a destination of all these squares to be sold in lots, and used as private property. Annunciation place was not so divided. This shows, that it was not destined to be sold, nor reserved for private use; but was dedicated to the public for the common good of all.

All the squares and lots intended for private property, are bounded on the plan by single black lines. No line of boundary is run around Annonciation place. It was left open, therefore, for the use of every body, which constitutes a dedication to the public. The place for the church, is surrounded by three black lines. These were not intended for lines of boundary, or there would have been a single black line, as around all the other squares and lots. They were intended to exhibit the foundation of the church, or some fanciful work around it.

The fact, that parts of two adjacent squares, and the sites of two streets, were taken to form the whole place, proves conclusively to any eye that looks upon it, that the whole was taken and united together, to form one large, beautiful and indivisible public place, for the use, gratification, amusement, pleasures, and also devotions, particularly of the inhabitants of the new faubourgs, and generally, of all others who might sojourn among them.

From all these facts and circumstances, and others of minor importance, I read on the plan of *Livaudais* and *Delogny*, as clearly as if it was written in sunbeams, that they dedicated the whole of Annunciation place to the public, forever, for these and other purposes.

Independently of the plan, the same thing is proved conclusively by their conduct, by that of the city and of the public. On the highest and most beautiful part of the faubourgs Lacourse and Annonciation, and directly on the line between them, there is a large oblong space, embracing the whole of one square, parts of two others, and the sites of two streets, which, from the foundation of

the faubourgs, until the present time, has been kept open, and surrounded by dwellings and otherwise improved lots on the adjacent squares. For forty years it has been called Annunciation place, which means a public place of that name. For forty years, all thought it a public place; for forty years, all men have used every part of it as a public place. The city, as the guardian and administrator of public things within its limits, has improved it as a public place, have surrounded the whole in one body, by a costly banquette, curb and gutter, enclosed it with a fence, and ornamented it with trees, which were rapidly converting it into a shady grove, *rus in arbe*, until this unfortunate suit. All were proud of their great public and indivisible place.

Public squares are almost essential to the health, convenience, and even prosperity of a great city in a southern latitude, and damp and sultry climate. Therefore, they are laid off on the ground, and abandoned by the founders of the cities, by dedication to the public. Sales are made of the other squares and lots, and possession given with reference to them. The purchasers of lots, especially fronting on such squares, give much higher prices for their lots, under the belief that the public squares are so dedicated. The adjacent lots are intrinsically far more valuable, on account of the incalculable value of the public square to the city in general, and the adjacent proprietors in particular. The founders of these faubourgs, availed themselves of all these considerations, received the advanced prices, resulting from the belief that this and other places were dedicated to the public, and all the general advantages to their other squares of such a dedication.

The founders of the faubourgs, during forty years, never claimed the property, and never used it in any manner. It was not assessed as their property; they paid no taxes, State, parish, or city, upon it. So far as appears, it was never taken into consideration in any of their civil transactions, and they have had many. They abandoned it, and the public used it.

The adjacent proprietors paid higher prices for their lots, under the firm belief that it belonged to the public, and during forty years, have been assessed higher, and paid higher taxes, from the universal belief that it was not private, but public property. That universal belief, so far from being ridiculed as in argument, should have great weight in a doubtful case.

The true principles on this subject, are developed by what occurred with regard to the faubourg Plaissance, in the city of Jefferson. The founder, *Wiltz*, sold out the most valuable part of the property on which it is situated; but in doing so, to insure high prices, dedicated to those who might become vendees, the common right of use of the battures in front, and of all the rear for pasture, without any limitation as to time. The vendors united together, and divided the battures and pastures into lots, for separate, and not common use. The heirs of *Wiltz*, sued for the batture and pasture, on the ground, as in this case, that their vendees had never formally accepted the dedication; that they had abandoned the use for which the property was dedicated, and that their ancestor had never parted with the title to the property, but only the exclusive use. All this was very true, but this court held, that he had abandoned all his exclusive rights to his vendees; and that it was unjust to those who had acquired the property with reference to his plan and dedication, that is, the abandonment of all his rights, to attempt to appropriate it again to himself. The same principle was the true basis of the decision in the case of *Dalabigarre's Heirs* v. *The Second Municipality*.

XIQUES
*v.*
BUJAC.

Much has been said in the argument and evidence about the contemplated church, who was to build it, the failure to use the part designated for that purpose, and the effects of the non-user.

In dedicating the square to public uses, the founders of the faubourgs merely abandoned to the public, all right, of every kind, which they might have to it. They did not obligate themselves to build the church, nor to cause the place to be used for that purpose. This may be illustrated by their dedication of another square on their plan for a college. They did not bind themselves to erect the buildings, or to supply them with teachers and scholars. But they gave the right to the vendors of their squares and lots, to do so. And another circumstance in that dedication, will illustrate the present: they limited it to a certain period, if the college was not established within the time, reserving, in that case, the right to resume the square. With regard to the church, they did not limit its establishment to any period, or reserve the right of ever resuming the property, if it was not established at all. The true effect of this dedication, was the abandonment of all their rights of property forever. Judge Martin, in the case of the Coliseum, expressed the true and only view of their position. They did not bind themselves to build the church; but obligated themselves never to build anything else on the ground.

It is true, they might have imposed a limit upon this dedication, for the failure to use it for the purpose intended; but a dedication without express limit, is presumed to be perpetual, especially when made for the purposes of religion or education, the necessity of which exists forever. If, therefore, there be no limit of the dedication, the abandonment is perfect and perpetual.

On the other hand, no obligation was imposed upon the vendees of other lots, or the public, to establish the church. From the nature of the dedication, however, the purchasers of the property included in the plan, and their successors, have, until the particular destination by the dedication is changed by the sovereign State, the right to establish a church upon the ground. In the meantime, the city, as the administrators of the public property and rights, should prevent any other buildings from being erected on the place. But the city might be compelled, at any time, to permit such a church to be erected on the premises, as a majority of the property holders of the faubourgs, between the river and Dryades street, might demand.

It is known, that in early times in Louisiana, the inhabitants settled as near their churches as possible. The enlargement of the public place, so as to enable the inhabitants to establish a church in its centre, was a master-stroke by the founders to augment the sale and price of their lots in the vicinity. At that time, the Spanish laws prevailed in the Territory of Orleans. A thing dedicated to God, fell within the class of things denominated sacred, and could not be alienated. The purchasers were induced, by these considerations, to pay much more for their lots, and the faubourgs filled up with population, thus filling the coffers of the original proprietors of the ground. One great inducement was, that in leaving the vicinity of their ancient cathedral or country churches, the settlers of the faubourgs saw, in their midst, the foundation of a house of God. The distinction between sacred and other things, was, indeed, abolished by the code of 1808, but vested rights could not be. The Catholic religion too, was predominant in the faubourgs at that early period, and the place was probably intended for a cathedral, but no denomination of christians was marked on the plan. A cross was exhibited, which all denominations profess to follow. The

speculating founders of the faubourgs, thought only of the advantageous sale of their lots, to which freedom of religion was essential, and, therefore, left the place open to the competition of all sects, as a majority might become purchasers. They made their speculation out of a conspicuous cross on their plan, and the purchasers paid higher prices, so far as religion was concerned, because they would be more convenient to a place of public worship, and because, on the sabbath, and even on other days, it would be the resort of the most quiet, well dressed, best behaved and useful people of the faubourgs, and, therefore, peculiarly eligible for the dwellings of families.

I have no doubt the additional aggregate price of the whole sales of the faubourgs, in consequence of the dedication of the whole place, with the compound interest, the interest the purchasers might have made in forty years, would now pay for a dozen such places; and, therefore, that vendors have received, and the vendees paid ample consideration for the whole dedication. And, therefore, that there is not the least foundation for the claim of the defendants to the property, but, that it should be decreed to have been dedicated by their ancestors, more than forty years ago, perpetually to great civil and religious purposes, for ample consideration paid and received by them at the time.

Rost, J.* In the case of *Livaudais and David* v. *Municipality No. Two*, 5 Ann. 8, decided before the resignation of Judge King, we were unanimously of opinion, that the plaintiffs had never been divested of their title to the property now in controversy, and in this, we but followed the opinion of our predecessors, in a suit between the same parties referred to, with approbation in the dissenting opinion. 16 L. R. 512.

In the former case, the answer was inartificially drawn, but being of opinion that the defence suggested in argument, could not have been sustained, if made at the proper time, we held, that the municipality had not been injured by the bad pleading of their counsel, as there is no new evidence of a dedication to public use in this transcript. I confess I am quite insensible to the lights which shine so brightly for my brother Preston, and so fully convince him, that our former opinion was wrong, and that the plaintiffs are without title.

I think, with the district judge, that the question of title ought to be considered as closed by the former decision. Having lately had occasion to determine that, in relation to public places and streets within this city, the municipal authorities represent not only the corporators, but also the public, and there being a final judgment against them in this case, and through them against the public and the corporators, I do not perceive how the plaintiffs can again bring the question before the court. I understand the power given to corporators, to sue in such a case, as existing only so long as the municipal government has not exercised it.

My impression is, that there are now no rights, in relation to that property, which the plaintiffs can exercise, unless they be rights of servitude established by contract in favor of their property fronting on Annunciation Square, and in that aspect, the case does not differ from that of *French* v. *The Carrollton Railroad Company*, 2 Ann. 80, in which we held, that the only servitude that could be claimed with any degree of plausibility, was the servitude of view; but that servitudes of that kind, never extended beyond the breadth of the street adjoining the property entitled to them. The servitude of view in this case, extends to

---

*The printer improperly inserted the judgment of Judge *Preston* before that of Judge *Rost*. The form "64" having been printed before it was discovered, it was too late for the Reporter to correct it.

the breadth of what is marked on the plan, as "Place de l'Annonciation," not to the ground reserved for the church, which, be it observed, is painted in the same color, as the squares offered for sale, and not as stated in the dissenting opinion, in the color of the two ends dedicated to public use, as the "Place de l'Annonciation.

On the merits, I fully concur with the opinion of the Chief Justice. There is no very material difference between any of us as to the law of dedication, but we differ on the question of fact, whether the dedication alleged, in this case, has been proved.

It is conceded, that no particular form of dedication is necessary; but the evidence of the intention to dedicate must be conclusive, and the dedication must be accepted by *user* or otherwise, in the sense in which it is made. If there was originally a dedication of the land in controversy, which I do not admit, it was a dedication to build a church, which was not accepted in seasonable time, for the purpose intended; and the popular conceit, that the land has been acquired to the public by another use, not thought of by the grantor, and exercised under the circumstances disclosed by the evidence, is to me an unsatisfactory basis for a judicial action.

I read so much of the transcript, as I am able to read, somewhat differently from Mr. Justice Preston, as to the meaning which the cross painted on the square, and the other mute signs of which he speaks, convey to his mind. I can only say, that the fabric he rears upon them, is in no sense, matter of record.

None of the numerous decisions which he quotes, conflicts with the view I take of the rights of the parties. The case of *Municipality No. Two* v. *The Cotton Press*, and the *Town of Carrollton* v. *The Carrollton Railroad Company*, are in strict conformity with it.

The opinion of Judge Martin, in 16 L. R., the substance of which has been stated by the Chief Justice, conclusively shows, that the question of the limitation of the right of ownership of the plaintiffs, not being necessary to a decision of that case, had not been maturely considered by him. I know no legal grounds upon which that limitation can be put, except those mentioned in the case of *French*, which have already been disposed of. The vague and undefined rights asserted in their behalf, are unknown to the law, whose decision should ever prevail over that of the judge.

*H. H. Strawbridge*, counsel for plaintiffs, for a re-hearing. The majority of the bench, as well as the dissenting judge, have both laid great stress upon the plan; but have given interpretations of its meaning diametrically opposite to each other, and differing upon matters of fact. Both, however, have justly considered, that the intentions of the founders by whom the supposed dedication was made, should carry great weight, and present the most certain basis for a proper construction of the contract. In reference to the most important feature of the now obscure and time-discolored plan, relied upon by both parties, his Honor Judge Rost says: "The ground reserved for the church is painted in the same color as the squares offered for sale." Were this remark accurate, I admit that it would form an argument of the strongest force in favor of the defendants.

The judge has probably been influenced by a plan annexed to an opinion of Judge Buchanan, rendered in a different case, and well calculated to mislead. That plan forms (to the best of my knowledge and recollection) no part of the record, never was filed as such in this suit, was not as such introduced in evidence. It is wholly *ex parte;* and when, during his oral argument, the counsel for the defendants produced and laid it on the judge's desk, he did not previously submit it to his antagonist, who supposed that the document was a clerkly copy of Judge Kennedy's opinion, having attached to it, for better illustration, another plan, which was referred to in argument before the lower court. Now, on the plan thus here presented, the quadrangle in contest, and

the squares offered for sale, are painted in the same color, conveying false impressions to the mind.

It is not so on the genuine and original plan of the faubourgs. That plan bears on its right hand corner, at foot, the signature of the founder *Delogny ;* and on the left hand corner, at top, that of *Livaudais,* above which may be indistinctly perceived the marks of writing which has been effaced, when or how, it is impossible to say. In the right hand corner. are written these words : " l.es parties jaunes appartiennent a *M. Jacques Livaudais,* et les rouges a *M. Robin.*"

I have already pointed out, that the division line between *Livaudais'* faubourg, styled Annunciation, and *Robin Delogny's,* styled Lacourse, would run diagonally across and bisect the square. On close examination, it will be perceived, not only that all the squares in faubourg Lacourse are colored by a single faint red line, drawn within a black one, but that the square marked " Colisée," and that marked " Prytanée," the one situated wholly, the other partially in *Livaudais'* faubourg, are nevertheless tinged with red, *Delogny's* color, indicating them to be his property. A still closer examination will detect in such squares in the faubourg Annunciation as are divided into lots, a faint and faded trace of yellow pencilling within the single black line surrounding each square, yellow being a much more perishable color than red. But the central quadrangle of Annunciation Square, is marked out only by triple plain black lines, shaded by neither red or yellow. This is matter of fact, upon which several gentlemen who have scrutinized the plan, agree with me ; and nine men out of ten will, upon inspection, unite in saying, that the quadrangle presents to the eye, no traces of any shading or tint whatever, save the yellowish stain diffused by time, or by the effect of varnish over the entire plan. Moreover, the division line between the faubourgs, defining with great sharpness and precision the lots, and even corners of lots lying within the limits of the respective founders, and cutting directly through other squares and lots all known. to be laid off for sale, is continued neither across the square or across its enclosed quadrangle, but stops short on reaching the outer limit of " Place de l'Annonciation," and is prolonged anew on the other side !

Now " *inclusio unius est exclusio alterius.*" The statement over the signatures of *Livaudais* and *Delogny,* that their respective colors were intended to designate their respective property, the parts "belonging" to them, implied that the spaces designated by neither color belonged to neither. The fact of the church quadrangle being marked in the very centre of a square confessedly public, strengthens the presumption, that it also was dedicated to public use. The very manner of writing the name " Place de l'Annonciation," the word " Place" on one side of the quadrangle, and " de l'Annonciation" on the other, so as to embrace it, as it were, confirms this idea. The defendants themselves do not contend that the spaces on the side towards Orange and Lacourse streets, form no part of the square proper ; yet these spaces are neither lettered or marked at all, save by rows of trees close to the line of the quadrangle, such as are represented as lining the principal streets. They are, however, embraced by the words " Place de l'Annonciation," as clearly as if these words had been repeated *ad nauseam.* I can scarcely conceive a stronger proof of dedication of the whole, the church quadrangle and its enclosing area or square, than this designation, contra-distinguished as it is from those which are expressly colored so as to indicate the property of the founders. It is a declaration, as plain as words could make, that the quadrangle was not to be regarded as their property ; and this is fortified by the public, general, and contemporaneous interpretation of the community, as the testimony proves, and by the silent acquiescence of the founders during more than forty years of their lives, passed principally, if not wholly, in New Orleans. The law on this subject, is distinct, that even " when the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with express or implied assent of the other, furnishes a rule for its interpretation." C. C. Art. 1951. And "in a doubtful case, the agreement is interpreted against him who has contracted the obligation." Art. 1952. It is also well settled, that in cases of sales according to a plan, the pictorial and other descriptions, the measurements, &c., of that plan, are to be considered as if recited by the act itself, and even controlling written statements contained in the act. *Suarez* v. *Duralde,* 1 L. R. 260. *Canal Bank* v. *Copeland,* 6 L. R. 551. *Millikin* v. *Minnis,* 12 L. R. 539. *Kirkpatrick* v. *McMillen,* 14 L. R. 497, &c.

XIQUES
*v.*
BUJAC.

Be it also remembered, that we are not contending with the original founders, who are dead, and cannot be interrogated as to what was intended by the various portraitures on their plan, but with their successors and representatives, who know nothing more of its meaning than we, and probably less. It should also be borne in mind, that the leading counsel for plaintiffs was sick and absent on the day of trial; and, that the oral argument of his associate was, partly by the anxiety of the court to reach another still more important cause, and partly out of necessary courtesy to the distinguished gentleman who appeared for the defendants, and was on the point of departure, cut short at the very outset. The plan was then taken away to the judge's consultation room, and the counsel for plaintiffs, thus compelled to refer to it from memory alone, labored under great disadvantages, and even fell into the error of stating in his brief, that the streets on the plan were nameless. A case of this kind, cannot properly be argued in writing alone; oral argument is almost indispensable.

The actual loss to front proprietors, by diminution of the value of their property, under this decision, cannot be less than $50,000. Claims will spring up to almost every public square and common in the city. Suit is already entered for Tivoli Circle in faubourg Delor; and, I believe, for Triton Walk also. I am myself counsel for persons entitled to claim Lafayette Square, by title paramount to *Jean Gravier's*; and, that square, was dedicated, if I do not greatly err, in no other manner than by leaving a blank and nameless space on the original plan of faubourg St. Mary. The central ground of Canal, and probably of Esplanade, Rampart and Basin streets, are exposed to similar pretensions. Many others might be enumerated; and, when we remember the numerous cities and faubourgs laid out in the speculative times of '37, it is difficult to say, how great and injurious will be the influence of this decision, upon the property of individuals and the health and prosperity of New Orleans. It is to be greatly regretted, that such a cause could not be tried before a full bench.

Other reasons might be urged and other views taken, but time presses, and enough, I trust, has been said to induce the court to pause, and ultimately accord a hearing more full than circumstances have hitherto permitted, the time allowed by your honors for argument on both sides being restricted to the narrow limits of less than an hour and a half.

Application for re-hearing refused.